# TAB 3

99-316

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

IN RE INTEK GLOBAL CORPORATION     : Civil Action
SHAREHOLDERS LITIGATION            : No. 17207
                                   :

- - -

Chancery Courtroom No. 106
Daniel L. Herrmann Courthouse
Wilmington, Delaware
Monday, April 24, 2000
2:01 p.m.

- - -

BEFORE:  HON. LEO E. STRINE, JR., Vice Chancellor.

- - -

SETTLEMENT HEARING

- - -

CHANCERY COURT REPORTERS
135 Daniel L. Herrmann Courthouse
Wilmington, Delaware 19801
(302) 577-2447

2

```
 1   APPEARANCES:   NORMAN M. MONHAIT, ESQ.
                    Rosenthal, Monhait, Gross & Goddess
 2                        -and-
                    STEVEN G. SCHULMAN, ESQ.
 3                  of the New York Bar
                    Milberg Weiss Bershad Hynes & Lerach
 4                    for the Plaintiffs

 5                  DANIEL A. DREISBACH, ESQ.
                    Richards, Layton & Finger
 6                    for Defendants Robert B. Kelly,
                      Eli M. Noam, Howard Frank,
 7                    Robert J. Shiver, Steven L.
                      Wasserman, John Wareham and
 8                    Intek Global Corporation

 9                  KENNETH J. NACHBAR, ESQ.
                    Morris, Nichols, Arsht & Tunnell
10                        -and-
                    STEPHEN A. RADIN, ESQ.
11                  of the New York Bar
                    Weil, Gotshal & Manges
12                    for Defendant Securicor PLC

13                          -   -   -

14

15

16

17

18

19

20

21

22

23

24
```

CHANCERY COURT REPORTERS

3

1          THE COURT:  Good afternoon,

2     Mr. Nachbar.

3          MR. NACHBAR:  Good afternoon.  This

4     is the time for the settlement hearing in In Re Intek

5     Global Corporation Shareholders Litigation.  Before

6     we begin, I just wanted to introduce my cocounsel to

7     the Court, Stephen Radin, of Weil, Gotshal & Manges.

8          THE COURT:  Good afternoon.

9          MR. NACHBAR:  Thank you, Your Honor.

10         THE COURT:  Mr. Monhait.

11         MR. MONHAIT:  I have a similar

12    introduction and a motion for pro hac vice admission.

13    I'm pleased to move the admission, for purposes of

14    these proceedings, of Steven Schulman of Milberg

15    Weiss Bershad Hynes & Lerach, lead counsel for the

16    plaintiffs in this action.  Mr. Schulman will be

17    making the presentation in support of the settlement.

18         THE COURT:  Good.  Good afternoon,

19    Mr. Schulman.

20         MR. SCHULMAN:  Good afternoon.

21         THE COURT:  I've signed the order.

22         MR. MONHAIT:  Thank you.

23         MR. SCHULMAN:  Your Honor, I'm happy

24    to present, today, the settlement of a class action

CHANCERY COURT REPORTERS

4

1   arising out of the majority's acquisition of the then

2   minority shares of a company known as Intek Global.

3   The original complaint had alleged unfair dealing and

4   unfair price under Weinberger, and set out facts

5   indicating that the company's value, as we alleged,

6   was greater than the price being paid.  The amended

7   complaint thereafter incorporated a series of

8   disclosure claims directed at the statements and

9   representations that had appeared in the tender offer

10  documents.

11              After a hearing was scheduled on a

12  preliminary injunction and discovery had commenced in

13  a highly compressed timetable, the parties negotiated

14  a nearly 10 percent improvement in the acquisition

15  price, amounting to approximately $4.3 million on a

16  transaction in the $50 million range, that being for

17  the public shares.

18              We are here to seek an order that

19  contains four elements:  Certification of the class

20  here in the context of a settlement; approval of the

21  settlement under the standards of Rule 23; granting

22  plaintiffs' counsels' request, in the event the

23  settlement is approved, for an award of attorneys'

24  fees and expenses in an amount set forth in the

CHANCERY COURT REPORTERS

5

1  papers; and from that sum, to the extent it is

2  allowed, permission to make what are termed special

3  payments of $10,000 to each of the four named

4  plaintiffs in the first-filed Sequeira action, again

5  to be paid out of any court-awarded attorneys' fees,

6  with no diminution to any member of the class.

7  Pursuant to the Court's order and

8  following the execution of the settlement

9  stipulation, notice has been duly provided to Intek's

10  record and beneficial holders. And I'm happy to

11  report that to the best of my knowledge, no

12  objections have been filed to any aspect of the

13  relief sought today. The courtroom appears to be

14  absent of any persons who might be an objector.

15  If I may briefly sketch the factual

16  background? Intek was, and presumably still is, a

17  development-stage company which is engaged in the

18  research and development of various forms of wireless

19  communication technology, as well as the manufacture

20  and sale of products and services related thereto.

21  Through a series of transactions in

22  the mid-to-late nineties, an English company known as

23  Securicor, which is in the same approximate industry,

24  acquired 61.3 percent of the stock and was clearly a

6

1   majority and controlling shareholder, subject to

2   duties of entire fairness in connection with a buyout

3   transaction.

4            In that regard, in January of 1999,

5   Securicor publicly announced it was reviewing its

6   strategic options with regard its investments in

7   Intek, which at that time included not only the stock

8   portion but as well, $70 million in debt financing

9   that were necessary to the company's achievement of

10   its plans, as it was then generating no positive cash

11   flow.

12            The Intek Global company, at the

13   behest of Securicor, formed an independent committee,

14   consisting of four and then two individuals. And

15   this committee then obtained the services of Bear

16   Stearns, as well as outside legal representation.

17            There was a series of negotiations

18   sketched out in the tender offer materials, a series

19   of bids, counterbids, a rather elaborate exchange of

20   information, all of which, of course, was not known

21   to the plaintiffs when the lawsuit commenced but was

22   revealed subsequently in the tender offer materials,

23   ultimately resulting in an agreement by Securicor and

24   Intek by which the minority shares would be

7

1    repurchased at $2.75 a share in a tender offer, to be

2    followed by a second-step merger once the tender

3    offer was concluded.

4              The significance of the tender offer

5    device, of course, was that it put the transaction on

6    a very fast track to completion, so that plaintiffs,

7    if they would seek relief against it, would also have

8    to move in a correspondingly expedited fashion.

9              Upon the announcement of the

10   transaction, this lawsuit was commenced.  And the --

11   shortly thereafter, the offer, which had been

12   announced on June 7th but in effect was the end

13   result of a negotiating process, was accepted.  The

14   merger agreement was signed and the tender offer

15   commenced.

16             It's worth noting, particularly for

17   the special payment portion, that both the complaint

18   and the amended complaint reflected substantial input

19   from the plaintiffs that arose from their

20   communications with the company's officers over a

21   period of time.  They are themselves sophisticated

22   investors.  They, themselves, directly or through

23   associates spoke for as much as 10 percent of the

24   public float and were very concerned about the

CHANCERY COURT REPORTERS

8

1     transaction; reached out, found the Milberg Weiss

2     firm, brought us into this transaction when they

3     suspected there might be a transaction in the offing

4     and, when the transaction occurred, authorized the

5     filing of the suit and gave us substantial

6     information with which to proceed.

7              THE COURT:  They were sort of copious

8     note takers during these conversations with

9     management?

10            MR. SCHULMAN:  That's how they had

11     described it.

12            THE COURT:  Somebody asked the

13     questions and another person sat down, furiously

14     writing it down.

15            MR. SCHULMAN:  Without waiving any

16     privilege, I've seen the notes myself.  The end

17     result of that was reflected in the opening

18     complaint.  It's a complaint that we believe had

19     merit in the pleading sense and, therefore, satisfies

20     the predicates for a settlement, as well as a fee

21     application.

22            Promptly after filing the amended

23     complaint, we moved for expedited discovery.  We did

24     so on the basis that we believed we had set forth

9

1   quite specific allegations as to alleged

2   nondisclosures.  The details are set forth in the

3   papers.

4            In general, they related to allegedly

5   valuable contracts that the company had entered into,

6   that we claimed were, in effect, not specifically

7   disclosed; that the company had embarked upon

8   innovative new technologies and broad-band technology

9   and VHF technology, which would give it substantial

10  value, that was not specifically disclosed or, we

11  claimed, reflected it had recently entered into what

12  we claimed was a very valuable contract with the NRTC

13  to sell its products, and had been awarded a very

14  substantial numbers of licenses in this VHF frequency

15  by the FCC in their auction only at the end of 1998.

16           The Court, in scheduling a

17  preliminary injunction proceeding on a conference

18  call in which we all participated in this room, did

19  specifically note the specificity of these

20  allegations, obviously without predetermining their

21  merit.

22           THE COURT:  I think -- didn't I say

23  these frivolous claims were raised very specifically?

24           MR. SCHULMAN:  I don't recall that,

CHANCERY COURT REPORTERS

10

1    but if the Court discerned there was some risk in the

2    case, then the rest of my analysis follows logically.

3                The parties then embarked on a rather

4    intensive two-week planned-out period of multiple

5    depositions, document production. Each of the four

6    plaintiffs in the Sequeira action were noticed for

7    depositions. Their documents were sought. In this

8    period, we retained two experts, an industry expert;

9    a sophisticated financial expert, as well. So we

10   were doing a lot of work. Milberg Weiss, as the sole

11   lead counsel, mobilized this team to take discovery

12   and brief and defend depositions on the same track.

13               I think an important factor that I

14   would like to bring out, because it goes to the

15   difficulty of the case, was that when Securicor

16   announced it had entered into -- actually entered

17   into negotiations, negotiating an offer of 2.75,

18   which was really the end result of the process, it

19   stated, "This is it. We are not going any further."

20               I think that is quite unusual, and I

21   think it underscores when you deal with large

22   companies like this, in transactions like this, which

23   reflected an end result of a process with the special

24   committee, when the plaintiffs shareholders come in

11

1   and they are not part of the back and forth between

2   the company and the acquiror, it is very difficult to

3   get them to move on the price.

4           Mr. Radin I think would confirm that

5   at least as far as the initial discussions were

6   concerned, I said candidly we would not settle this

7   case on any terms other than an increase in the

8   price, even though that was far in excess of the

9   relief we could have gotten on preliminary

10  injunction.  He was very firm that his client would

11  not increase the price.

12          This is where the discussions stayed

13  for some period at the beginning.  But as the

14  proceedings heated up, and on the backdrop of what we

15  were developing and the pressures of the PI

16  proceedings, we did get into further settlement

17  negotiations, and this did cause a breakthrough in

18  which Securicor, the buyer, did finally indicate

19  flexibility on the price.

20          So just as there had been between the

21  special committee, as reported in the tender offer

22  materials, and Securicor, we engaged in a series of

23  offer and counteroffer, which led to, ultimately, an

24  agreement that $2.75 per share price to the public

CHANCERY COURT REPORTERS

1 would be increased by 26-and-a-quarter cents per

2 share, amounting to an approximate 9-and-a-half

3 percent increase, rounding out to about a $4.3

4 million increase.

5    It was also agreed that the

6 company -- companies, together, would issue

7 substantial supplemental disclosures.  In particular,

8 a supplement did then issue that gave very great

9 specificity on the WorldTeam expression of interest,

10 which turned out not to have been a significantly

11 credible matter but would be material to

12 shareholders, we claimed, in assessing their

13 strategic options.

14    And there was a lengthy discussion of

15 the O'Hara report, which in the middle of

16 negotiations had brought about a reduction in Intek's

17 projected performance over a five-year period,

18 raising suspicions on our part that the numbers were

19 being changed in the middle of negotiations to

20 achieve a predisposed result.

21    But their evidence showed that the

22 O'Hara report was prepared independently by a

23 management person.  It was gone over by senior

24 management.  It was gone over by Bear Stearns and by

13

1    the special committee.  And their position was that

2    this reflected a credible midcourse correction that

3    was unrelated to achieving any predisposed price.  It

4    was based on that change that the special committee,

5    which had been resistant to 2.75 per share, came

6    around to the view that it would accept it.  In the

7    face of that report and the company's declining

8    projections, we still were able to extract not only

9    disclosure about it, but a higher price from the

10    buyer.

11                THE COURT:  Where in the record is

12    the supplemental disclosure?

13                MR. SCHULMAN:  I believe it was

14    marked -- it should have been marked as an exhibit.

15    If not, we could proffer it to the Court.  If I may,

16    briefly, Your Honor?  I don't have the exhibit

17    number.

18                What I think happened was that we

19    completed the discovery on July 7 and 8, and the

20    supplemental disclosures came out later in the month

21    of July.  So in fact, the document was probably not

22    placed into the record.  I could cure that omission

23    promptly, Your Honor.

24                THE COURT:  If you could cure it so I

CHANCERY COURT REPORTERS

14

1    can -- I should have -- I should have called you all

2    about it, because when I -- I reviewed the record

3    last week, I didn't come across the supplemental

4    disclosure.

5                      MR. SCHULMAN:  I actually -- the

6    Court's question is well taken.  I actually have a

7    clean copy of it.  But I regret to say that when I

8    reviewed the copy I received, it was missing page

9    three.  So I had that faxed over the other night from

10   Weil, Gotshal.  If the Court would pardon the

11   informality --

12                     THE COURT:  Sure.

13                     MR. SCHULMAN:  -- I would be happy to

14   proffer to the Court this document, which is an

15   integral copy.

16                     THE COURT:  If we could make a more

17   beautiful copy a part of the formal record, I think

18   that would be appropriate.

19                     MR. SCHULMAN:  Given the exigencies,

20   I would like to get it in front of the Court today.

21                     THE COURT:  Sure.  But if others are

22   ever reviewing it --

23                     MR. SCHULMAN:  Let me just say --

24                     THE COURT:  This is the supplement.

15

1          MR. SCHULMAN:   That page is page 2

2    and 3.   The entire document actually is the

3    supplement.

4          THE COURT:   Is the supplement --

5          MR. SCHULMAN:   It goes into great

6    detail about WorldTeam.   It goes into great detail

7    about the O'Hara report.   It goes on to disclose the

8    February and May projections and the reasons, in

9    detail, for the decline in the projections.   It's

10   quite an informative document, in our view, and forms

11   an integral part of the settlement package.

12          Your Honor, based on this factual

13   background, I would like to submit that the class

14   here on a settlement should be approved.   The four

15   named plaintiffs in the Sequeira action have

16   submitted affidavits in which they testified, among

17   other things, that they held the shares at the time

18   of the tender offer and before, and continued to hold

19   it through the date of the closure of the tender

20   offer, and therefore, have the same standing as other

21   class members, the same claims.   And clearly, there

22   is numerosity and commonality.   We would submit the

23   class should be approved under the Prezant decision.

24          Turning to the settlement, we would

16

1    submit, again, the settlement is eminently fair for a

2    number of reasons.  We break our analysis into two

3    parts.  First we speak of the preliminary injunction,

4    because this was our area of major leverage.  And of

5    course, we were at risk that we would make a great

6    effort and the Court, as it often does,

7    unfortunately, in this situation would find there was

8    no basis for injunctive relief, even though we had

9    set forth what admittedly looked like substantial

10    grounds to begin with.  And we continue to believe we

11    had done so.

12              The defendants' position was the

13    total mix of information in the disclosure document,

14    including a filing with the SEC of the Form 13E-3,

15    which included Bear Stearns' and Lazard's investment

16    banker books, was sufficient to address the global

17    situation of this company.

18              To put it another way, their position

19    was that the contracts, particularly business

20    transactions that we had identified as

21    nondisclosures, were either immaterial of themselves

22    in light of the company's total picture or, more

23    significantly, had been reflected in the projections.

24    And those projections were the basis for Bear

CHANCERY COURT REPORTERS

17

1   Stearns' discounted cash flow analysis, which was

2   disclosed in the tender offer materials from the very

3   beginning.

4           To the extent we would call upon the

5   company to present to the shareholders more detailed

6   information on the projections, they would

7   undoubtedly have argued this was in the nature of

8   soft information that they didn't have a duty to

9   disclose; they disclosed the total picture, and

10  therefore, they were in conformity with the duty of

11  candor.

12          These were issues that were not

13  clear, in my opinion.  I think on the merits, we did

14  have, if not a substantial likelihood of success --

15  the test -- we had very colorable claims, in my

16  opinion, and the discovery cutoff at a point in the

17  middle.  I think under the crucible of adversarial

18  proceedings, we probably could have a very strong

19  hearing on that, but it was unnecessary because we

20  did reach what I thought was a settlement that was

21  better than was available through the injunctive

22  process.

23          THE COURT:  What did you think your

24  strongest claim was, strongest claim of omission?

CHANCERY COURT REPORTERS

18

1        MR. SCHULMAN:  I think that the -- I

2   think that the strongest claim, in our view, was that

3   the shareholders didn't really appreciate the 188

4   licenses, the interaction with the technology, which

5   put this company in a very path-breaking condition as

6   far as its entry into the wireless industry was

7   concerned.

8        And I think the theory would have

9   been that you can't really understand a projection in

10  this kind of cutting-edge industry, where multiples

11  can go through the roof sometimes, without knowing

12  what the underlying technology of the company is, and

13  its most significant markets.  And the tender offer

14  materials were bereft of discussion of either of

15  those matters, or so we claimed.

16        So in our view, those matters,

17  whether or not they were reflected in the

18  projections, were quite significant.

19        THE COURT:  The licenses were the

20  licenses that the company successfully obtained at a

21  modest price --

22        MR. SCHULMAN:  Yes.

23        THE COURT:  -- at the end of '98?

24        MR. SCHULMAN:  Yes.  I think also we

19

1    had questions from a substantive standpoint, which I

2    think could have become disclosures, as to the nature

3    and timing of this O'Hara report.  While the

4    subsequent evidence suggested that it was appropriate

5    and not an issue of suspicion, nonetheless, again

6    from an adversarial standpoint, one could have

7    questioned how the special committee could first

8    reject a price, then be briefed by management, which

9    had connections with Securicor, and then adopt the

10   very transaction it had rejected.  If this didn't

11   suggest unfair dealing, it certainly, in our view,

12   could have been laid out in a way that suggested some

13   problem from disclosure that should be set out more

14   clearly.  But the defendants would have argued, "Hey,

15   you learned that from reading the tender offer

16   material.  You knew it as well as we did."

17            At the end of the day, I think the

18   hard information on the core development of the

19   company's business were the key points.

20            THE COURT:  Did the original

21   materials indicate that the investment bankers books

22   were available?

23            MR. SCHULMAN:  They did not.  I

24   looked carefully for that.  I looked for

CHANCERY COURT REPORTERS

1  incorporation by reference of the 13E-3, or some

2  reference to that.  Undoubtedly, they would have

3  argued they were in the  public domain, but -- I

4  could be in error on this, but I did look carefully a

5  number of times, and I didn't see either the

6  projections that underlay the reports or the specific

7  incorporation by reference of the 13E-3.  Again, we

8  would have had an issue about shareholders access to

9  that information.

10         This being the case, and because

11  defendants often argue that it's uncertain what will

12  be the state of the company and/or the transaction if

13  if a PI is granted, we felt it was the better part of

14  valor, particularly on these terms, to settle the

15  case.  We were also affected in this analysis by the

16  chances of prevailing at trial, which could happen

17  years down the road, if it was to happen at all.

18         We would simply note in this context

19  what appeared to be a well-separate, operating

20  special committee, that had engaged in extensive

21  negotiations, had received the routine, orthodox

22  outside advice.  There were fairness opinions.  The

23  most significant point I think was Securicor's

24  argument that this company's plans and projections

21

1    were all contingent on achieving a substantial

2    financing; that the projections didn't take account

3    of the ability to finance; that this company, because

4    of its developmental nature and lack of cash flows,

5    didn't have meaningful access to any financing other

6    than that of Securicor.  Securicor had no obligation

7    under Delaware law to put the company up for sale and

8    made clear it wasn't interested in extending further

9    tens of millions of dollars without acquiring all of

10   the public float.

11            So at the end of the day, this

12   transaction was almost an all-or-nothing transaction

13   for the company.  And in that context, it would have

14   been very difficult to establish either that there

15   was unfair dealing or an unfair price.  All the facts

16   came out through the discovery process, and the

17   subsequent disclosure materials, suggesting risk at

18   trial, not with respect to the initial pleading of

19   the case.

20            THE COURT:  What about -- I think you

21   alleged somewhere that Bear Stearns had a previous

22   relationship with the company.

23            MR. SCHULMAN:  Yeah.  The allegation

24   was that Bear Stearns was retained by the special

1    committee, and then it came out that Bear Stearns was

2    doing some other work for the company in the terms of

3    the formulating its projections, which would enmesh

4    it with interaction with management and the like.

5    But I think their perspective on it was that -- this

6    was that of the special committee, that Bear Stearns

7    did this as an outgrowth of the representation of the

8    special committee, and therefore, any apparent

9    conflict was very, very thin.

10             THE COURT:  They had been working for

11    the special committee.

12             MR. SCHULMAN:  Actually, they were

13    already working for the special committee.  This

14    became an additional engagement, in our view.  They

15    claimed it was all part of the same engagement.

16             THE COURT:  They were refining --

17    were they part of how the projections got refined for

18    the O'Hara report?

19             MR. SCHULMAN:  In effect, yes.  They

20    did become part of the taking the O'Hara report

21    projections, working with management and then

22    refining it.  In a sense, they became on both sides

23    of the same analysis.

24             THE COURT:  Yeah.  It's a little odd;

23

1    isn't it?

2            MR. SCHULMAN:  Yes, it is.  That and

3    then they changed lawyers in midstream.  There was a

4    change from Manatt Phelps to Gibson, Dunn.

5            But these issues didn't seem be

6    overwhelmingly strong issues.  Perhaps in the light

7    of further discovery, they might have been.  But as

8    it looks to us right now, they were coloration but

9    did not really change the complexion of the case,

10   which is that on a 50/50 basis, probably were not the

11   favorite in going forward.

12           I think discounting for all the risks

13   and uncertainty, delay, cost and the like, I can not

14   see how this $4.3 million increase on a $50 million

15   deal is anything other than fair and reasonable,

16   although that is my position.  It's more for the

17   Court to decide.

18           THE COURT:  You had your own

19   financial advisor?

20           MR. SCHULMAN:  Yes, we did, Triumph

21   Partners.  They looked --

22           THE COURT:  What was their conclusion

23   about the -- where the ultimate price was in terms of

24   their valuation of the company?

1          MR. SCHULMAN:  The enhanced price?

2  They were comfortable with the enhanced price.  They

3  supported us on the view that the initial price,

4  which even on their analysis was below the midpoint

5  of the DCF, was inadequate.  And they looked at --

6  they also looked at comparables.

7          There was a debate here as to whether

8  or not DCF was the lone analysis that should be

9  employed or whether comparable companies or

10  comparable transaction analyses could be used.  There

11  was an implicit debate about which premium you should

12  use.  Was it 30 days before, or did you look at a

13  year before, or was that a germane analysis?

14          They claimed you could not look at

15  the company on a comparables basis because there were

16  no comparables, yet when they did the DCF analysis,

17  they used comparables to get discount rates.  At the

18  end of the day, our advisor used a more multifactored

19  analysis.  He backed us up on this.  That's why when

20  we negotiated to increase it, we started out

21  substantially higher than 2.75.

22          THE COURT:  Where did you start out?

23          MR. SCHULMAN:  We started out at

24  around 3.25, which we felt was reasonable in the

1    spirit of compromise and was close to the maximum

2    price that the special committee demanded in a

3    context that we understood was an aggressive posture

4    by them to move the ball a little bit further on the

5    side of Securicor.  We felt it was a responsible

6    opening proposal that would lead to an increase but

7    was not so high as to chill the process from the very

8    beginning.  We try to observe that balance when we

9    are trying to get more money for shareholders.  We

10   try to be responsible in that way.

11              THE COURT:  Why do you think the

12   defendants settled?  Why do you think they gave you

13   the 25 cents or 26 cents?

14              MR. SCHULMAN:  I think they were

15   concerned about the appearance of the O'Hara report.

16   I think it was a little less than neat and tidy with

17   respect to Bear Stearns and change of the lawyer.  I

18   think had we gotten into discovery of the CEO, we

19   might have developed through him some contradictions

20   between quotations that he made, allegedly, in the

21   presence of our clients about certain product lines

22   and their potential impact on the company.

23              THE COURT:  When I read the

24   complaint, there were specific statements attributed

26

1   to the CEO.  That was based on conversations that

2   your clients had?

3                MR. SCHULMAN:  Yes.  He would have

4   had to admit it.  It would have caused tension in the

5   portrayal of the proxy materials, in our view.  While

6   I can't read their minds, and while there are often

7   business reasons for doing these that I don't

8   imagine, if we look at it from a purely legal

9   standpoint those kind of factors, plus the fact that

10  we were shaking things up with a preliminary

11  injunction proceeding in the face of a tender offer,

12  put them under pressure, which is where we want to

13  put the defendants in a situation like this, provided

14  we have a good case, which we believed we did.  We

15  were able to generate from the Weil, Gotshal firm a

16  settlement dynamic, and the result speaks for itself.

17                That being the case, after we

18  negotiated the settlement, there was, as there often

19  is in these cases, a separate negotiation as to a

20  fee.  And I say that because it's important that we

21  point out that that is separate.  It doesn't become

22  part of the dynamic.  It's also important to point

23  out here, in addition to the lack of any objection,

24  that this was an entirely arm's-length -- maybe two

CHANCERY COURT REPORTERS

27

1   arm's-lengths -- negotiation between myself and

2   Mr. Radin, my clients and his client.  And they have

3   agreed to pay this amount out of their own pocket.

4   It results in no diminution on the part of any value

5   given to any member of the class.  While this does

6   not divest the Court of its discretion, I think it's

7   important to place it in that context.

8              It's also important to note that not

9   only is the benefit substantial -- in my experience,

10  quite a significant percentage benefit increase.  I

11  do a lot of these cases.  I don't have what I call an

12  empirical chart, the type an investment banker would

13  present to his client.  I think it's a very

14  substantial percentage increase.  It was in the face

15  of the company's public statement that it had drawn a

16  line in the sand; it wouldn't go any further.

17             The increase is solely attributable

18  to the litigation efforts of plaintiffs' counsel and

19  their clients.  It is not a shared-benefit case, as

20  the Court often sees.  There is no issue here as to

21  quantification or responsibility for the benefit.

22             It is in this context that we come to

23  the Court seeking a 33 percent fee, 33 percent of the

24  enhanced amount.  In support of that, we have urged

CHANCERY COURT REPORTERS

28

1  for the Court's consideration precedents, in this

2  Court as well as federal courts, approving 33 percent

3  fees.

4         One analysis that we have drawn was a

5  comparison to the Amdahl litigation which we had some

6  involvement with a couple of years ago, but recent

7  enough for comparison, in which Amdahl was bought out

8  by its Japanese majority shareholder, and in a much

9  bigger transaction, many, many hundreds of millions

10 of dollars.  The shareholders again went into

11 preliminary injunction mode and negotiated a $28

12 million increase, which was less than -- around 3

13 percent of the total merger consideration, then

14 applied for a fee of -- and were granted a fee of $7

15 million, which amounted to a very substantial

16 multiple of their time, if one looks at things that

17 way, 25 percent.  This is 33 percent.

18         And there has been a suggestion

19 sometimes in the Delaware cases that a certain logic

20 of sliding scale is employed.  And while this is a

21 substantial, multimillion dollar settlement in its

22 own right, I think one could look to bigger

23 settlements, where bigger fees are awarded on a 25

24 percent bench mark, and say that supports this

CHANCERY COURT REPORTERS

29

1   number.  We have given the Court the benefit of other

2   decisions in federal court in analogous common fund

3   cases, where similar fees have been awarded.

4              I would simply add, in addition to

5   the factors that I mentioned, that we thought we

6   brought particular skill and expertise to this

7   matter; that we moved skillfully and swiftly on both

8   litigation and negotiation fronts at the same time;

9   that I would note Bear Stearns had five months to

10  master this material and was receiving a fee of $3.1

11  million.  We mastered this area in a few weeks, and

12  we brought to bear significant pressure on the

13  company and brought about --

14              THE COURT:  You didn't even get to do

15  additional forecasting work.

16              MR. SCHULMAN:  That's right.

17              THE COURT:  At least I'm not aware.

18              MR. SCHULMAN:  We have not been

19  retained for any other purpose.

20              THE COURT:  You and Mr. Radin will

21  take care of that and bring you on in some case.

22              MR. SCHULMAN:  We would be happy to

23  terminate today.  We did invest over 700 hours on the

24  case.  It was done on a fully contingent basis.  As

CHANCERY COURT REPORTERS

30

1   is well-known in this Court, the Court of Chancery

2   does not apply a Lindy-type lodestar analysis.  It

3   does look to the time, does look to the services.  It

4   looks to the reputations of the lawyers involved, and

5   those on the opposition.  I think we stand up nicely

6   on all those criteria.  There is a substantial policy

7   in this jurisdiction of awarding on the benefit

8   primarily, and the way that benefit is achieved.  I

9   think that we stand up well.

10          And I would submit that for all these

11  reasons, the fee is not only within a range of

12  reasonableness, but reasonable.  I think that in this

13  context, the agreement of sophisticated people,

14  bargaining as arm's length on this number, on this

15  record, commends the approval of the fee.  I do

16  submit it, subject to approval of the settlement,

17  which brings me to my final topic, which is the

18  unusual so-called special payments.

19          The clients in this case have gone

20  above and beyond the call of duty.  There is

21  authority in this Court for breaking with the norm

22  that class plaintiffs do not derive a benefit

23  different than those of other class members.  This is

24  really a corollary to the common fund doctrine.  The

CHANCERY COURT REPORTERS

1   Sprague versus Ticonic Bank case may have begun with

2   a plaintiff or a litigant bringing a common benefit.

3   Then this became a doctrine that was appropriated by

4   lawyers.

5              In this case, the Sequeira plaintiffs

6   had substantial information that was litigable

7   information, that provided the predicate for a

8   complaint that, if my analysis is correct, brought

9   substantial pressure to bear on the defendants, and

10  but for their input and their determination to

11  achieve an enhanced result, cash based, we would not

12  be standing here today with this kind of result, or

13  maybe any kind of result.

14             They have recited in their papers

15  they have collectively put in over a hundred hours of

16  their own time in this matter.  I can represent that

17  at every stage of the negotiations they were actively

18  involved in back and forth with me, and that the

19  position of firmness we took with the defendants was

20  substantially motivated, as it should be, by our

21  clients.

22             The unusual thing is the information

23  they brought to bear and the time they spent, which I

24  think is above the norm.  Thus, in this context,

32

1   having disclosed the matter fully in the notice, and

2   having received no objection to that treatment, as

3   well, we would ask that under the precedents of this

4   Court and the specific record we have made, that

5   these payments -- which again involve no diminution

6   to the class but will come solely out of what the

7   Court awards in the way of fees -- of $10,000 to each

8   of the named plaintiffs in the first filed action --

9   not all the plaintiffs, but these particular

10  plaintiffs, be approved.

11              That concludes my remarks, Your

12  Honor.  If you have any comments, questions?

13              THE COURT:  No.  Anything from the

14  defendants?

15              MR. SCHULMAN:  Thank you, Your Honor.

16              THE COURT:  Give me five minutes.  I

17  want to -- so that I can be -- review the

18  supplemental disclosure, and I'll be back.

19              MR. NACHBAR:  Your Honor, we do have

20  the order and final judgment.

21              THE COURT:  That would be great.

22              (Recess at 3:35 p.m.)

23              THE COURT:  Start with the class

24  certification.  Class certification is appropriate

CHANCERY COURT REPORTERS

33

1  under the Prezant standards.  I note the order, I

2  believe, sets forth the requisite findings, which are

3  easily satisfied in cases of this nature.

4           Turning to the approval of the

5  settlement itself, it seems to me fairly obvious that

6  the settlement confers a substantial benefit on the

7  class.  This was a not an insignificant increase in

8  the consideration offered to the minority

9  stockholders over the original Securicor tender offer

10  of $2.75 per share.  It's also clear that the

11  increase is solely attributable to the litigation.

12           This is a situation where the special

13  committee process had already run its course before

14  the litigation really kicked in and had any effect at

15  all.  And given that the original offer was 2.75, an

16  increase of 26 cents a share is not a mere trifle in

17  percentage terms, or in real terms, to the

18  stockholders.  That's a substantial benefit.

19           I've also reviewed the quite detailed

20  supplemental disclosure, which is, for buffs of this

21  sort of thing, an interesting document, filled

22  with -- chock-filled with financial information about

23  the company, which would be very helpful to a

24  stockholder determining whether to accept

34

1    consideration or to seek appraisal.  And that

2    supplemental disclosure also flowed directly out of

3    the litigation.

4              I think that, you know, given the

5    standard that needs to be applied here, it's clearly

6    a reasonable judgment to settle the case on these

7    terms.  The case had been expedited and there was a

8    potential for an injunction of the transaction, but

9    really, the injunction of a transaction like this

10   would probably only result in an order of the Court

11   requiring disclosure of information largely of the

12   nature that was obtained by way of the supplemental

13   disclosure anyway.  It's doubtful that much more than

14   that could have been achieved at the injunctive

15   stage.

16             And had the case gone to trial, the

17   plaintiffs would have faced the difficulty of dealing

18   with the fact that there was a special committee, it

19   was represented by law firms and investment banks of

20   the type usually worthy of respect.  I understand

21   there is -- according to the plaintiffs, there was a

22   little bit more here that would -- more evidence here

23   that they were in an awkward situation, but they are

24   advisors of the type that have been found in other

35

1   cases to reliably and independently advise special

2   committees.

3          There also appeared to be, based on

4   the discovery to be taken, objective reasons that

5   explain some of the drops in the projections.  As I

6   noted at the scheduling conference, the amended

7   complaint was admirably specific with respect to the

8   omissions alleged.  I didn't really speak to the --

9   whether the omissions alleged were material, but it

10  was -- the complaint was very pointed.  And discovery

11  into those factors indicated that they were a lot

12  less troubling -- that the concerns that the

13  plaintiffs raised were a lot less troubling,

14  probably, in reality than the plaintiffs thought when

15  they first alleged them.  But on balance, clearly,

16  the increase of 26 cents a share and the substantial

17  supplemental disclosure supports the release that is

18  being given to the defendants.  I approve the

19  settlement.

20         Similarly, I'm going to approve a fee

21  in the amount requested.  As Mr. Schulman noted, the

22  primary -- the primary factor that the Court looks to

23  in awarding a fee is the benefit conferred.  And I

24  do -- it would be hypocritical of me not to note that

36

1    I do look at the hours worked in cases, because I --

2    the only way I can get a sense of whether I'm

3    awarding a windfall sometimes is to look at the

4    hours.  But the primary thing you look at is the

5    benefit conferred.  And here, the fee is coming

6    entirely out of the defendants' pocket.  It doesn't

7    diminish the 26 cents a share that was obtained for

8    the class, and it doesn't in any way diminish,

9    because the class doesn't have to bear the freight,

10   the benefits of the supplemental disclosure, which

11   were also obtained on the class's behalf.  And

12   clearly, a motion to expedite was brought.  There was

13   hard-fought negotiations.

14           I don't think, ordinarily --

15   defendants represented by lawyers of the quality on

16   the defense side in this case don't ordinarily give

17   up 26 cents a share on an offer of $2.75.  I think

18   that speaks well of the effort the plaintiffs'

19   counsel put in.

20           And so I'm going to award a fee in

21   the full amount.  I also note that in these

22   situations where the fee is being borne entirely by

23   the defendants and there seem to be hard fought

24   negotiations, the Court I think is less inclined to

CHANCERY COURT REPORTERS

37

1   sort of muck around in it.  And that is certainly

2   true for me.

3           And so I'm going to sign the order.

4   The amount I believe is $1,432,000.

5           MR. MONHAIT:  That's correct, Your

6   Honor.

7           THE COURT:  Also, in reliance on the

8   prior precedence of allowing special payments of this

9   type, I think that the affidavit of Mr. Schulman and

10  of the named plaintiffs fairly supports their request

11  for the modest payments to -- I believe it's four of

12  the named plaintiffs.  And so I'm going to sign the

13  order incorporating that provision, as well.

14          I thank you all for your time.  If

15  you could, make sure the supplemental disclosure is

16  in the record in a more formal way, I would

17  appreciate it.

18          MR. SCHULMAN:  We shall do so, Your

19  Honor.

20          (Recess at 2:52 p.m.)

21              - - -

22

23

24

CHANCERY COURT REPORTERS

38

## CERTIFICATE

1
2           I, WILLIAM J. DAWSON, Official Court

3    Reporter of the Chancery Court, State of Delaware, do

4    hereby certify that the foregoing pages numbered 3

5    through 37 contain a true and correct transcription

6    of the proceedings as stenographically reported by me

7    at the hearing in the above cause before the

8    Chancellor of the State of Delaware, on the date

9    therein indicated.

10          IN WITNESS WHEREOF I have hereunto

11   set my hand at Wilmington, this 10th day of May,

12   2000.

13

14

15   _____
          Official Court Reporter
16          of the Chancery Court
              State of Delaware
17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

IN RE INTEK GLOBAL CORPORATION            )    CONSOLIDATED
SHAREHOLDER LITIGATION                    )    CIVIL ACTION NO. 17207

## FINAL ORDER AND JUDGMENT

-The Stipulation of Settlement dated February 29, 2000 (the "Stipulation" or "Settlement") of the above-captioned actions (the "Litigation"), having been presented to the Court at a hearing on April 24, 2000 (the "Settlement Hearing") held pursuant to this Court's Order dated March 7, 2000 (the "Scheduling Order"), the Court having heard and considered evidence in support of the proposed Settlement, and an opportunity to be heard having been given to all persons requesting to be heard in accordance with the Scheduling Order, and the proposed Settlement having been considered by the Court;

IT HEREBY IS ORDERED, ADJUDGED AND DECREED as follows:

1.    This Court finds and concludes that class certification is appropriate under Court of Chancery Rules 23(a) and (b) and certifies the Litigation as a class action pursuant to Court of Chancery Rules 23(b)(1) and (b)(2) on behalf of a class (the "Class") consisting of all persons other than defendants and their affiliates who owned shares of common stock of Intek Global Corporation ("Intek") on January 19, 1999, and their successors in interest and transferees, immediate and remote, through and including the completion of a tender offer on August 17, 1999 by Security Services plc ("Security Services"), a wholly-owned subsidiary of Securicor plc ("Securicor"), for any and all shares of Intek at a price of $3.0125 per share (the "Tender Offer"), and the closing of a second-step cash-out merger on August 25, 1999, pursuant

to which Security Services acquired all shares of Intek that Securicor (or Security Services) did not already own at a price of $3.0125 per share (the "Merger"). This Court finds that (i) the Class is so numerous that joinder of all members is impracticable, (ii) there are questions of law and fact common to the Class, (iii) plaintiffs' claims are typical of the claims of the Class, and (iv) plaintiffs and their counsel have fairly and adequately protected the interests of the Class.

2.    This Court certifies plaintiffs as class representatives and plaintiffs' counsel as class counsel.

3.    This Court finds and concludes that notice was given to members of the Class in compliance with the Court's Scheduling Order.

4.    This Court finds and concludes, with respect to both the form of the notice given and the procedure used to give notice, that the notice given is the best notice reasonably practicable under the circumstances and fully satisfies the requirements of Court of Chancery Rule 23, the Constitution of the United States and any other applicable law.

5.    This Court finds and concludes that the Settlement, pursuant to which the price offered for shares of common stock of Intek was increased from $2.75 per share to $3.0125 per share, with payment to each stockholder rounded to the nearest cent, in the Tender Offer and in the Merger, and pursuant to which the parties' counsel conferred in good faith concerning defendants' disclosure of material information in connection with the Tender Offer, and defendants made mutually agreed upon supplemental disclosures in connection with the Tender Offer and the Merger, is fair, reasonable, adequate and in the best interests of the Class, and this Court approves the Settlement.

6.    The Effective Date of the Settlement shall be ten days following the later of the following events: (i) if there is not an appeal or appeals, other than an appeal or appeals

- 2 -

solely with respect to attorneys' fees and reimbursement of expenses, the date upon which the time expires for filing or noticing any appeal of the Final Order and Judgment (as defined below) other than an appeal solely with respect to attorneys' fees and reimbursement of expenses awarded pursuant to the terms of this Stipulation and (ii) if there is an appeal or appeals, other than an appeal or appeals solely with respect to attorneys' fees and reimbursement of expenses, the completion, in a manner that affirms and leaves in place the Final Order and Judgment, of all proceedings arising out of the appeal or appeals (including, but not limited to, the expiration of all deadlines for motions for reconsideration or rehearing or petitions for certiorari, all proceedings ordered on remand, and all proceedings arising out of any subsequent appeal or appeals following decisions on remand).

7.     Upon the Effective Date, the following parties will be released (the "Released Parties") with respect to the Released Claims (as defined below):  Defendants and their present or past heirs, executors, estates, administrators, predecessors, successors, assigns, parents, subsidiaries, associates, affiliates, employees, agents, insurers, directors, managing directors, officers, partners, principals, members, attorneys, accountants, financial and other advisors, investment bankers, underwriters, lenders, and any other representatives of any of these persons or entities.

8.     Upon the Effective Date, the following claims will be released (the "Released Claims") with respect to the Released Parties:  All claims and rights, whether known or unknown, belonging to any or all plaintiffs and any or all members of the Class and their present or past heirs, executors, estates, administrators, predecessors, successors, assigns, parents, subsidiaries, associates, affiliates, employees, agents, insurers, directors, managing directors, officers, partners, principals, members, attorneys, accountants, financial and other

advisors, investment bankers, underwriters, lenders and any other representatives of any of these persons and entities, including, without limitation, any claims, whether direct, derivative, representative or in any other capacity, arising under federal, state, local, statutory or common law or any other law, rule or regulation, including the law of any jurisdiction other than the United States, that relate in any way to (i) any allegation or claim that any action by any of the Released Parties, or any failure of any of the Released Parties to take any action, affected the price of Intek's stock, (ii) the acquisition or ownership of equity securities of Intek or any affiliate of Intek by Securicor or any of the Released Parties, (iii) loans made to Intek or any affiliates of Intek by Securicor or any of the Released Parties, (iv) the fiduciary duties of any of the Released Parties to holders of Intek stock, (v) the January 19, 1999 Announcement, (vi) the Tender Offer, (vii) the Merger, (viii) the negotiation, consideration or formulation of the Tender Offer or the Merger, (ix) the disclosure obligations of any of the Released Parties in connection with the Tender Offer or the Merger, or (x) any other claim, other than claims for appraisal of shares pursuant to 8 Del. C. § 262, relating in any way to the Litigation or any of the subjects listed in items (i) through (ix) above.

9.    The term "unknown" in the definition of the Released Claims includes claims that any or all Plaintiffs or members of the Class do not know or suspect to exist, which, if known by him, her or it, might affect his, her or its agreement to release the Released Parties and the Released Claims, or might affect his, her or its decision to object or not to object to the Settlement. Upon the Effective Date, Plaintiffs and members of the Class shall be deemed to have, and by operation of the Final Order and Judgment in the Litigation shall have, expressly waived and relinquished, to the fullest extent permitted by law, the provisions, rights and benefits of § 1542 of the California Civil Code, which provides as follows:

- 4 -

> A general release does not extend to claims, which the creditor
> does not know or suspect to exist in his favor at the time of
> executing the release, which if known by him must have materially
> affected his settlement with the debtor.

Upon the Effective Date, Plaintiffs and the Class also shall be deemed to have, and by operation

of the Final Order and Judgment shall have, waived any and all provisions, rights and benefits

conferred by any law of any state or territory of the United States, or principle of common law,

or the law of any jurisdiction other than the United States, which is similar, comparable or

equivalent to § 1542 of the California Civil Code.   Plaintiffs, on behalf of the Class,

acknowledge that members of the Class may discover facts in addition to or different from those

that they now know or believe to be true with respect to the subject matter of this release, but that

it is their intention, on behalf of the Class, fully, finally and forever to settle and release the

Settled Claims, including unknown claims, as that term is defined in this Paragraph.

    10.    Plaintiffs and members of the Class are permanently enjoined from

commencing or prosecuting, either directly or indirectly, any action in any court asserting any of

the Settled Claims.

    11.    The Litigation is dismissed with prejudice and without costs except as

provided for in this Stipulation and the Final Order and Judgment.

    12.    Attorneys' fees and reimbursement of expenses (including, but not limited

to, fees of plaintiffs' financial advisor and industry advisor) are awarded in the amount of

$ _11,432,000_. Plaintiffs' counsel are permitted to pay $10,000 of the amount awarded by the

Court as a special payment to each of plaintiffs Richard F. Sequeria, Kenneth J. Anderson, James

E. Ryan and William Goodwin (a total of $40,000).  The firm Milberg Weiss Bershad Hynes &

Learch LLP has the sole authority to determine the allocation of attorneys' fees between and

- 5 -

among plaintiffs' counsel based upon their respective services rendered and contributions to the outcome of the Litigation.

       13.    The Register in Chancery is directed to enter and docket this Final Order and Judgment.

_____
Vice Chancellor

Date: April 24, 2000

166760

# TAB 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:COMMERCIAL DIVISION
-------------------------------------------X
ARNOLD WANDEL, Derivatively on Behalf of
Nominal Defendant BED BATH & BEYOND INC.,

                 Plaintiff,          Index No. 603665/06

       -against-

WARREN EISENBERG, LEONARD FEINSTEIN,
STEVEN H. TEMARES, ARTHUR STARK,
MATTHEW FIORILLI, RONALD CURWIN,
EUGENE CASTAGNA, ROBERT S. KAPLAN,
DEAN ADLER, VICTORIA MORRISON, FRAN
STOLLER, KLAUS EPPLER, STEVEN [sic]
BARSHAY, JORDAN HELLER, and ESTATE
OF ROBERT J. SWARTZ,
            Defendants,

BED BATH & BEYOND INC.,

           Nominal Defendant.
-------------------------------------------X

**FILED**
MAY 18 2007
NEW YORK
COUNTY CLERK'S OFFICE

Charles Edward Ramos, J.S.C.:

    Defendants, officers and current/former members of the board

of directors of Bed Bath and Beyond Inc. ("BBB"), move pursuant

to CPLR 3211 (a)(1), 3211(a)(7), and Business Corporation Law

("BCL") § 626(c), to dismiss the Amended Complaint of plaintiff,

Arnold Wandel, suing derivatively on behalf of nominal defendant

BBB.

<u>Background</u>

    On January 4, 2007, plaintiff filed an Amended Complaint

against the board of directors[1] and officers[2] of BBB seeking

---

   [1] Defendants on the board of directors of BBB are as
follows: Robert S. Kaplan, Dean Adler, Victoria Morrison, Fran
Stoller, Klaus Eppler, Steven [sic] Barshay, Jordan Heller,
Robert J. Swartz(deceased 2001).

   [2] Defendants that are officers of BBB are as follows: Arthur
Stark, Matthew Fiorilli, Ronald Curwin, Eugene Castagna, Warren
Eisenberg, Leonard Feinstein, Steven H. Tamares.

damages for alleged violations of fiduciary duties, unjust enrichment, gross mismanagement, and corporate waste.

The complaint alleges that the named defendants are liable to BBB for taking part in a stock option backdating scheme, that allowed Eisenberg, Feinstein, and Tamares to attain higher values on their stock options by changing the exercise price (the purchase price of the stock on the date issued), to a more financially advantageous date (with a lesser exercise price) in order to make gains after it is known that the stock price had risen. This scheme is alleged to have occurred over the past 14 years costing BBB millions of dollars.

On June 5, 2006, Merrill Lynch issued a report that included BBB on a list of companies that showed increases in share trading prices subsequent to stock option grant dates. A similar report was issued by Deutsche Bank on June 14, 2006. On June 19, 2006, the Board appointed an "independent special committee[3]" ("Special Committee")to investigate the matter. On June 20, 2006, the committee retained the firm of Weil, Gotshal & Manges, LLP ("Weil Gotshal") as independent legal counsel to conduct an investigation. On June 25, 2006, Weil Gotshal engaged Navigant Consulting, Inc. to serve as independent accounting experts. After an extensive investigation, the Special Committee generated a detailed report. The report confirmed evidence of backdating of options, however backdating was deemed to have been

---

[3] The Committee was comprised of defendants, Jordan Heller and Steven Barshay.

2

unintentional.  On September 20, 2006, BBB voluntarily reported its findings to the Securities Exchange Commission ("SEC").  On October 10, 2006, BBB made the report public.

Based on the review of the report, the Special Committee recommended that the Company reform its policy with regard to stock option grants by adopting a number of new controls.  BBB adopted the recommended reforms.  Additionally, BBB is revising the dates of certain option grants, pursuant to applicable accounting principles.  BBB has determined through a financial analysis, that there were no material changes to its financial condition in any relevant period.  Therefore, BBB need not restate its historical financial statements.  However, BBB will record an adjustment of approximately $65 million in the equity section of its consolidated balance sheet for the fiscal year ending March 3, 2007.  This adjustment will cover the aggregate of "non-material" charges in the prior fourteen years.  BBB will also record a $7.2 million charge in its third quarter income statement covering the first three quarters of the current fiscal year.

In December 2006, BBB reset the price of all unvested options, increasing the exercise price on the dates the Special Committee had determined to be the appropriate measurement dates. Due to this adjustment affecting not only executives, but lower-level employees as well, BBB has agreed to repay the price differential to the latter.  The executives will not receive such repayment.

3

## Legal Standards

When assessing the adequacy of a complaint on a motion to dismiss pursuant to CPLR 3211(a)(7), a court must afford the pleadings a liberal construction, accept the allegations of the complaint as true, and provide the plaintiff "the benefit of every possible favorable inference." *Leon v Martinez*, 84 NY2d 83, 87-88 (1994). Whether a plaintiff can ultimately prove its allegations is not part of the calculus in determining a motion to dismiss. Id. The motion must be denied if from the pleadings' four corners "factual allegations are discerned which taken together manifest any cause of action cognizable at law." *511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 152 (2002), quoting *Guggenheimer v Ginzburg*, 43 NY2d 268, 275 (1977).

"Dismissal under CPLR 3211(a)(1) is warranted 'only if the documentary evidence submitted conclusively established a defense to the asserted claims as a matter of law.'" Id, quoting *Leon supra* at 88.

BCL § 626(c) provides that in a shareholders' derivative action "the complaint shall set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort."

## Discussion

As a preliminary matter, in opposing defendants' motion to dismiss, plaintiff does not address any of the remedial actions that BBB has undertaken in response to the Special Committee's recommendations as well as the monetary adjustments made to stock

4

option grants.  Nor does plaintiff address or argue any possible inadequacy of the remedial actions.  BBB's voluntary actions could render plaintiff's complaint moot.

In any event, defendants' motion to dismiss the Amended Complaint is granted because plaintiff failed to make a demand on the Board, and board futility was not pled with particularity in accord with BCL § 626(c).

Generally:

> "the demand requirement rests on basic principles of corporate control--that the management of the corporation is entrusted to its board of directors who have primary responsibility for acting in the name of the corporation and who are often in a position to correct alleged abuses without resort to the courts.  The demand requirement thus relieves courts of unduly intruding into matters of corporate governance by first allowing the directors themselves to address the alleged abuses."  *Bansbach v Zinn*, 1 NY3d 1,8 (2003) (internal citation omitted).

A demand by a shareholder that the corporation initiate an action would be futile if a complaint alleges <u>with particularity</u> that (1) a majority of the directors are interested in the transaction, (2) the directors failed to inform themselves to a degree reasonably necessary about the transaction, or (3) the directors failed to exercise their business judgment in approving the transaction. *Marx v Akers*, 88 NY2d 189, 198 (1996).

Defendants correctly contend that plaintiff failed to make a demand on the Board of Directors and failed to allege with particularity that such a demand would have been futile. Paragraphs 60, 61, 63 of the Amended Complaint set forth the plaintiff's reasoning why a demand on the Board would have been futile.

60. "...demand would be futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute the action."

61. (b) "...as members of the Stock Option Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties...Moreover, by colluding with Officer Defendants...(they) have demonstrated that they are unable or unwilling to act independently..."

(c) "...as a [sic] members of the Compensation Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties...Moreover, by colluding with Officer Defendants...(they) have demonstrated that they are unable or unwilling to act independently..."

(d) "...as members of the Audit Committee they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching fiduciary duties...Moreover, by colluding with the Officer Defendants...(they) have demonstrated that they are unable or unwilling to act independently..."

(e) "...as directors of the Company, they directly participated in and approved the filing of false financial statements and other SEC filings...Moreover, by colluding with the Officer Defendants and others...(they) have demonstrated that they are unable or unwilling to act independently..."

63. "Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment."

As the Court of Appeals held in *Marx supra*, "It is not sufficient, in a shareholder's derivative action, merely to name a majority of the directors as parties defendant with conclusory allegations of wrongdoing or control by wrongdoers to justify failure to make a demand." Id at 199-200. "The statute requires that the complaint shall set forth with particularity the reasons

for not making such effort." Id.          ₐ

It is undisputed that the three directors (Eisenberg, Feinstein, and Tamares) that personally benefitted from backdating stock options are "interested" in the transaction. However, what is lacking in plaintiff's allegations is why the seven other directors were interested in the backdating of stock options. As *Marx* instructs, conclusory allegations as to director control or wrongdoing is insufficient to satisfy BCL § 626 particularity requirement. The mere presence of directors on committees is not particular as to their individual participation or alleged collusion with interested directors in the backdating of stock options.

Furthermore, with regard to demand futility, the Amended Complaint is deficient as to how the directors allegedly failed to inform themselves to a degree reasonably necessary about the transaction, or how directors allegedly failed to exercise their business judgment in approving the transaction.

As to the former, the complaint is completely silent on the directors' failure to keep fully informed. As to the latter, although paragraph 63 above, is on point, this broad conclusory allegation is patently insufficient to pass muster under BCL § 626. "Demand is excused because of futility when a complaint alleges with particularity that the challenged transaction was so egregious on its face that it could not have been the product of sound business judgment of the directors." *Marx* at 200. The complaint fails to address any egregiousness act in support of

7

demand futility.

    Accordingly,

    It is ORDERED, that defendants' motion to dismiss the

Amended Complaint is hereby granted.

Dated: May 3, 2007



HON. CHARLES E. RAMOS
J.S.C.

        Counsel are hereby directed to obtain an accurate copy of
this Court's opinion from the record room and not to rely on
decisions obtained from the internet which have been altered in
the scanning process.

FILED
MAY 18 2007,
NEW YORK
COUNTY CLERK'S OFFICE